IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| NYEI LLC, dba Hampton Inn Pendleton, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 100605D |
| | ) | |
| v. | ) | |
| | ) | |
| UMATILLA COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DEPARTMENT OF REVENUE, | ) | |
| State of Oregon, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | **DECISION** |

Plaintiff appeals the 2009-10 real market value of property identified as Account 112583 (subject property). A trial for the above-entitled matter and *NYEI LLC v. Umatilla County Assessor and Department of Revenue, State of Oregon*, TC-MD 110340D was held in the Oregon Tax Courtroom, Salem, Oregon, on October 18 and 19, 2011. Rohn M. Roberts, Attorney at Law, appeared on behalf of Plaintiff. Harish Patel (Patel), subject property's owner, and Joseph B. Skilton (Skilton), Oregon and Washington certified general appraiser, testified on behalf of Plaintiff. James C. Wallace, Senior Assistant Attorney General, appeared on behalf of Defendant and Defendant-Intervenor (Defendants). Steven Tucker (Tucker), Principal Appraiser, Oregon Department of Revenue, and Paul Chalmers (Chalmers), Umatilla Director of Assessment and Taxation, testified on behalf of Defendants.

Plaintiff's Exhibits 1, 2, 3, 4, 7, 8, and 9 and Defendant's Exhibits A, B, and C were received without objection. Plaintiff's Exhibit 10 was received with objection. Plaintiff's Trial

/ / /

Memorandum, delivered and filed October 18, 2011, and Defendant-Intervenor's Pre-Trial Brief, filed October 17, 2011, were acknowledged.

## I.  STATEMENT OF FACTS

The parties agreed that the subject property is a "74-room franchised [Hampton Inn] hotel, in a single, four-story building[,]" located on 1.44 acres in Pendleton, Oregon.  (Ptf's Ex at 20; *see also* Def's Ex A at 16, 20.)  The "common area amenities * * * include a fitness center, business center, indoor pool and spa, two elevators, public restrooms, seating for continental breakfasts, a commercial laundry room for in-house housekeeping, a guest laundry room, and a lobby/front desk area[]" located on the first or ground floor.  (Def's Ex A at 21; Ptf's Ex 1 at 20.)

Patel, the subject property's owner, testified that a 2.36 acre parcel was purchased for $353,000 in 1997 and subsequently "in 2007 [was] partitioned into two separate lots," with one of the parcels the site of the subject property's "limited service hotel" that "opened for business in July 2008."

A.      *Location and highest and best use*

Tucker described the location of the subject property as follows:

> "an area of freeway oriented development at a major freeway interchange
> (Highway 11 and Interstate 84).  The area around this interchange along SW Nye
> Avenue is the primary area of hotel development in Pendleton.  There are 5 hotels
> in the immediate area.  Surrounding development and freeway exposure suggests
> hotel use as the highest and best use as vacant.  * * * The five hotels in the
> immediate area include:  Best Western, Holiday Inn Express, Motel 6, Red Lion,
> and Super 8.  The Red Lion has an on-site restaurant and other on-site amenities,
> and it is best classified as a full service hotel.  The subject and other hotels are
> best classified as limited service hotels."

(Def's Ex A at 44.)  Skilton concluded that the "subject as vacant would have appeal for development of a secondary use[]" and the "[o]ptimum use[]" for the "subject site as vacant is functional for development, with good access and average exposure[] * * * of an auto-oriented service or secondary retail use."  (Ptf's Ex 1 at 39.)  Skilton testified that if the "land was

vacant," he would not "conclude that the highest and best use would be a limited service hotel, because it is feasible that the market did not need 74 additional first tier rooms." Patel testified that, after consulting with Hampton Inns and based on his operation of the subject property for the last few years, "this is the wrong product in the wrong location." Both Skilton and Tucker concluded that the subject property's highest and best use as improved is its existing use as a limited service hotel. (*Id*.; Def's Ex A at 50.) Skilton testified that "demolition and conversion" of the existing improved use was not "indicated."

Patel testified that in addition to the four hotels, Best Western (69 rooms), Holiday Inn Express (64 rooms), Motel 6 (48 rooms) and Super 8 (50 rooms), that are located at the same interchange as the subject property, there are two other competitors seeking the same "transient" customers. (*See* Ptf's Ex 1 at 40.) He testified that the Oxford Suites (87 rooms) is located "one exit west from the subject property," and the Wildhorse Resort and Casino is located approximately "2 miles" from the subject property and is adding 200 rooms to its existing 100 rooms with a targeted completion date of 2012. Patel testified that he recently attended a meeting of the lodging owners to discuss how another "200 rooms" will impact their businesses. Patel testified that given the "casino expansion," which "he didn't know [about] when he commenced construction," in addition to the "increase in construction material costs and gas prices" in 2007, he would not have built this hotel.

B.    *Valuation approaches*

In their testimony, Skilton and Tucker discussed the three valuation approaches and referenced their appraisal reports. (*See generally* Ptf's Exs 1, 4; Def's Ex A.) The parties agreed that both Skilton and Tucker are qualified to determine the subject property's real market value. (*See* Ptf's Ex 4 at 78-83; Def's Ex A at 98.)

### 1. *Cost approach - land*

In determining the land real market value, Skilton looked for comparable properties with a "highest and best use, as service commercial land." (Ptf's Ex 1at 44.) After identifying five comparable properties sold in 2008 and located in Pendleton and Hermiston, Oregon and Kennewick and Walla Walla, Washington, Skilton noted "qualitative" adjustments:

"[a] positive (+) adjustment indicate[d] that a comparable [was] inferior to the subject regarding a specific (or set of related) characteristic(s) and must be adjusted upward to simulate rough parity with the subject property. Likewise, a negative (-) adjustment indicate[d] that a comparable [was] superior to the subject in some regard and must be adjusted downward to compare with the subject property. The resulting net adjusted market value [was] a weighted average of all the identified characteristics (not every adjustment carries the same weight)."

(*Id.*) Tucker disputed the comparability of Skilton's land sales to the subject property, noting the comparable properties' location, topography, and quality. Skilton ultimately concluded a price per square foot of $5.75 for the subject property, within the range of $1.81 per square foot to $5.76 per square foot. (*Id.* at 44-45.) His "final opinion of land value of the subject site" was "rounded to **$360,000**." (*Id.* at 45.) (Emphasis in original.)

Tucker selected three comparables land sales, all located in Pendleton, Oregon, with "similar zoning," that sold in 2006, 2007, and 2009. After adjusting the sale prices for time, Tucker computed an "Adjusted Acre Unit Price" for each comparable property, resulting in a range of $207,764 to $365,424 and an average of $290,938 per acre. (Def's Ex A at 60, 61.) Tucker determined an "Indicated Value per Acre" of $325,000 and an "Indicated Value" for the subject property of $470,000. (*Id.* at 61.)

### 2. *Cost approach - improvements*

Skilton testified that he developed a "cost estimate" for the subject property "using the Marshall Valuation Manual, Calculator Cost Analysis Section." (*See* Ptf's Ex 1 at 51.) Skilton concluded that "[b]ased on this analysis, direct, indirect and site improvement costs are

concluded at $4,301,349 or $94.83/SF GBA, including site improvements, architects fees, and contractors overhead." (*Id*. at 52.) To that amount, Skilton added an eight percent "developer overhead and contingency," to determine "a total replacement cost new of $4,674,257." (*Id*.)

Skilton testified that even though "[t]he cost approach, exclusive of functional and external obsolescence, indicates a value of $4,800,000[,] [t]he final opinion of stabilized market value concluded in" his "appraisal[] is $2,115,000[,]" and the "difference, $2,685,000, [between the cost approach and stabilized market approach] is allocated 1/3 to functional and 2/3 to external obsolescence." (*See id*. at 53.) Skilton testified that the subject property "suffers" from functional obsolescence because "[f]or the specific location, and also compared in terms of quality and size with hotels in the greater node, the 4-story subject hotel appears to be an over-improvement." (*See id*.) In addition, Skilton testified that the subject property "suffers" from external obsolescence because the "subject was determined in the highest and best use analysis to be not feasible; available income under current market conditions would not justify development costs, and the project would not be built today. The subject suffers significant external obsolescence." (*See id*.) He testified that, as of January 1, 2009, the "market was in free fall." Skilton testified that, because the subject property was placed in service in July 2008, an owner would spend the first few months fixing "construction deficits" and therefore a depreciation expense of "two years of a 40 year life cycle" was appropriate. Tucker disagreed, testifying that, because the construction was "just completed," there was no "physical deterioration" as of January 1, 2009.

Tucker testified that "to estimate the replacement cost of the buildings and site improvements[,]" he used "Marshall & Swift, a nationally recognized cost service." (*See* Def's Ex A at 61.) He testified that, to the determined building and site costs of $5,193,724, he added

the following "soft costs:" engineering computed "at 6.0% of building cost;" architectural computed "at 5.0% of building and site costs;" permits and legal determined to be $10,000; and developer's profit "at 10.0% of construction costs." (*See id*. at 61, 63.) Tucker testified that, for the subject property, there "is no physical deterioration, functional, or external obsolescence." (*Id*. at 62.) He determined a total replacement cost new of $6,327,759. (*See id*. at 63.) Tucker testified that the "Project Draw Report for Bay Bank was provided by the owner as proof of construction costs for the building," stating a total cost of $4,708,245. (*See id.* at 62.) He noted that those total costs were "very similar to the building improvement costs estimated by the Marshal [*sic*] & Swift Valuation Service of $4,818,304[]" and a "Federal Asset Report" stating total costs of $6.2 million. (*See id*. at 62, 100.) Tucker was questioned as to why he added costs for elevators, engineering, and architecture, when Marshall & Swift states that those costs are in the "base cost." Tucker responded that if he was provided another opportunity to calculate the cost he would not "add in elevators ($218,000)," but he would add additional cost for engineering and architecture. Tucker testified that the "best indicator of cost is actual costs."

Skilton and Tucker disputed the "quality" of the subject property. Skilton concluded that the subject property's quality was slightly above average ("average plus"), using $84.60 per square foot for the base cost. Tucker concluded that the subject property's quality was good "compared to the competition," using $90 per square foot for the base cost. Tucker testified that the subject property is "the newest, nicest hotel in town."

3.      *Cost approach – total value*

Skilton concluded a total land and improvement "replacement cost new stabilized value" of $2,115,000. (Ptf's Ex 1 at 54.) Tucker concluded "a cost approach value of $470,000 bare

/ / /

land value plus $6,327,759 total improvement value for a total value of real estate only of * * * $6,800,000" (rounded). (Def's Ex A-62.)

4. *Income capitalization approach*

Skilton testified that in using the income approach the "[s]ubject market position is reflected in Revenue per Available Room (RevPAR)." (*See* Ptf's Ex 1-55.) For the subject property, Skilton testified that he determined a RevPAR of $37 and "[s]tabilized gross sales of $999,370," including "actual vacancy and collection loss, but not discounts or transient lodging taxes." (*See id*.) After deducting discounts and transient lodging taxes, Skilton determined an "Effective gross income of $894,811." (*Id*.) (Emphasis in original.) Skilton testified that he did not include "the discounts and transient lodging taxes" in expenses. Tucker testified that the RevPAR reported by Smith Travel Research (STR) "is already net of discounts and room tax" and Skilton is "subtracting it twice."

Tucker testified that he computed RevPAR "as the ADR [average daily rate] ($95) multiplied by the occupancy rate (65%), or $61.75 per day." (*See* Def's Ex A at 79.) Tucker testified that he determined an effective gross income of $1,667,868, and to that amount he added "[o]ther income of $80,421 * * * for total effective gross income of $1,748,289." (*See Id*.) He testified that the "other income" is based on "national averages for typical hotels" as stated in "Smith Travel Report, Pacific Region." Tucker explained that he could not "rely" on the subject property's "operating statements" because as of January 1, 2009, the "income was not stabilized."

The appraisers were questioned at length about their determination of the subject property's occupancy percentage and RevPAR. Skilton testified that he determined the subject property's RevPAR after reviewing and considering the subject property's actual operating net

income, expense ratio, RevPAR–Actual and RevPAR–Forecast, and the "STR ('star') report,

compiled by Smith Travel Research," that "includes four local properties in the same general

location and market stratum: Hampton Inn [the subject property], Best Western, Holiday Inn

Express, and Oxford Suites." (*See* Ptf's Ex 1 at 41.) Skilton testified that "[t]he subject is not

meeting expectations" and even though the "[s]ubject RevPAR rose over this period [2008 to

first half of 2010], as operations ramped up to stabilized occupancy," the subject property

"remains below the market average." (*See id*. at 42.) Skilton testified that he concluded

"RevPAR at 2010 levels ($37.00) is supported for the subject as stabilized, with market

occupancy in the 35% -- 45% range." (*See id*.) Tucker testified that his "[m]arket ADR at the

subject is * * * based on interviews with managers of competing properties and information from

Smith Travel Research, including the same four local properties used by Skilton plus the "Super

8." (*See* Def's Ex A at 77, 78.) Patel refuted Tucker's conclusion that Super 8 is one of the

subject property's competitors. Tucker testified that those interviews were conducted "four

months ago; the conversations occurred in 2011." Tucker testified that "little weight is given [to]

historical occupancy, average daily rates, or expense levels" because the "2008 historical

operating statements provided by the owner do not reflect stabilized operations throughout the

entire year." (*See id*. at 79.) Tucker's appraisal report states that "[t]he Smith Travel Research

survey indicates occupancy of 58 percent" and concluded that "these averages are low" because

the subject property was included and "did not operate at stabilized occupancy for all of 2008."

(*Id*. at 78.) The parties discussed the STR report as of December 2008, noting that the

"competitive set data excludes the subject property," and the competitive set stated that

occupancy for 12 months ending December 2008 was 59.5 percent, the ADR was $92.95 and

RevPAR was $55.34. (*See* Ptf's Ex 8.) The STR report as of December 2009 reported lower

occupancy (56.6 percent), lower ADR ($88.34), and lower RevPAR ($49.97) for the same competitive set. (Ptf's Ex 7.) Referencing the STR report, Skilton testified that between December 2008 and December 2009 the occupancy rate for the competitors declined 6.6 percent and the RevPAR declined 4.4 percent. (*See id.*)

Patel testified that Hampton Inns requires a "point-of-sale" transmission to STR at the time the room is rented. Skilton testified that because the "STR report is confidential there is less reason for an owner/operator to exaggerate" and he places more reliance on the STR survey than individual interviews with "a person behind the desk."

In determining various operating expenses, Skilton relied on the subject property's actual expenses and operating expenses for two properties he previously appraised. (Ptf's Ex 1 at 56, 57.) Skilton testified that the "[m]iscellaneous line item and reserves for capital replacements are concluded at market levels." (*See id.* at 57.) Skilton testified that total annual operating expenses, including property taxes determined using actual property tax expenses for four local properties, were $645,964 or 72.19 percent of effective gross income. (*See id.*) Skilton testified that in using the "actual operating expenses" he "removed travel expense, debt and interest expense, and contribution deductions."

Tucker concluded that, because the subject property's "historical operating statements do not reflect stabilized expense levels, the Smith Travel Research Host Study for limited service hotels in the Pacific Region of the U.S. is used as a basis for estimating individual stabilized expenses." (Def's Ex A at 79.) In his appraisal report, Tucker wrote:

> "The average expense ratio in the Host Study is 64.2 percent. The average expense ratio of the 8 comparable sales used in the sales comparison approach is 64.2%. This is very strong evidence the expense ratio at the subject should be near 65 percent."

/ / /

(*Id.*)  Tucker testified that he concluded "a slightly higher expense ratio at the subject of 67.6%, due primarily to above average franchise royalty fees and replacement reserves."  (*See id.*)

Skilton determined the subject property's net operating income to be $248,847 after a property tax expense deduction and $287,327 without a property tax deduction.  (Ptf's Ex 1 at 60, 61.)  Tucker determined the subject property's net operating income to be $566,025.  (Def's Ex A at 80.)

An overall capitalization rate, according to Skilton, "is a market-derived ratio of net operating income to cash equivalent sale price."  (Ptf's Ex 1 at 57.)  In determining the subject property's overall capitalization rate, Skilton considered "the Korpacz investor survey, 1[st] quarter 2010," but concluded that "Korpacz surveys mostly investment-grade properties, and is only weakly representative of the Pendleton, OR lodging market."  (*Id.*)  Skilton "extracted" overall capitalization rates "from franchised and good-quality non-flagged hotels throughout a regional market area[,]" resulting in "[c]omparables rang[ing] from 9.29% to 14.73%, and cluster[ing] in the 9.5% - 10.28% range."  (*Id.* at 58.)  Skilton concluded that the "[c]omparables support an overall rate for the subject mildly above 11.88% and below 12.5%[,]" resulting in "an overall capitalization rate of 12.0%" for the subject property.  (*Id.* at 59.)   Skilton testified that the "risk and uncertainty in the market" suggested the "higher capitalization rate."   Tucker testified that Skilton used "old, inferior properties to develop capitalization rate," referencing the age and condition of the Howard Johnson in Waldport, Oregon and the Traveler's Inn, "built in the 50s with small rooms, in downtown Pendleton."

Tucker testified that he reviewed capitalization rates "extracted from the market[,]" relying on the sale of eight comparable properties occurring primarily in 2007.  (Def's Ex A at 82.)  In his appraisal report, Tucker wrote:

> "The average capitalization rate of the 8 comparable sales used in the Sales Comparison Approach is 9.5%, with a range of capitalization rates from 7.57% to 10.93%. The subject is in new condition considerable superior to the average of the comparable sales. The concluded market capitalization rate for the subject is 9.0%.
>
> "* * * * *
>
> "The capitalization rate is adjusted upward by the millage rate multiplied by the county's change property ratio for this property type, or (1.97127 x 0.6688) 1.32 percent. The capitalization rate after the effective tax rate adjustment is 9.0% + 1.32%, or 10.32%."

(*Id*. at 83.) Tucker was asked why he "used only one sale after the economic downturn" and "properties that had been in service for years." Tucker responded, testifying that he used the "best sales available." He testified that an appraiser can consider sales after the assessment date if those sales "confirm an existing trend."

Skilton applied "the concluded capitalization rate (12.0%) to the forecasted NOI [net operating income] ($248,847)" to determine an "indicated market value, which is rounded to: **$2,075,000**." (Ptf's Ex 1 at 59.) (Emphasis in original.) Skilton stated in his appraisal report:

> "A common method of analysis in tax appeals, is to omit real estate taxes from line item expenses, and apply the millage rate [1.91 percent] to the overall capitalization rate [12 percent]. This method * * * returns an indicated stabilized value of: **$2,065,000**."

(*Id*.) (Emphasis in original.) Skilton was questioned as to how he computed the millage rate. Tucker testified that Skilton should have adjusted the "millage rate" for the "change property ratio."

Tucker testified that he "reconciled to a direct capitalization approach value excluding business value and replacement reserves for FF&E [furniture, fixtures, and equipment] of $6,180,619 less FF&E in place of $740,000 for a real estate only value * * * rounded to: **$5,400,000**." (*See* Def's Ex A at 85.) (Emphasis in original.)

For his "Effective Gross Income Multiplier Analysis", Tucker testified that, using the eight comparable sales previously identified, effective gross income multipliers were computed, ranging from "3.53 to 4.04 with an average of 3.81." (*See id*. at 86.) Tucker concluded that, because "the subject is considerably newer than the comparable sales," he "reconciled to a multiplier of 3.9[]" and an "indicated value" of $6,643,498 before a deduction of "the value of FF&E in place of $740,000" or "a real estate only value of $6,078,327[,]" rounded to $6,080,000. (*Id*.)

5.      *Sales comparison approach*

Skilton testified that he considered the sales comparison approach as a "check" on his determination of the subject property's real market value using the income approach.   Using the qualitative approach applied to his land comparable sales analysis, Skilton identified five sales of comparable properties and compared those properties to the subject property. (Ptf's Ex 1 at 62.) For each of the five comparable properties he computed a price per unit, ranging from $22,940 to $65,961. (*Id*.)  Skilton concluded that his "[c]omparable sales analysis support[ed] a unit value for the subject hotel, distinctly above $25,000/unit, and well below $63,492/unit * * *." (*Id*. at 63.)  Skilton testified that he used the net operating income per unit ranking analysis, comparing net operating income per unit to "sale price per unit and multipliers extracted * * * in an attempt to refine the value indication." (*See id*.)  In his appraisal report, Skilton wrote:

> "Extracted multipliers range from 6.32 to 10.53, with 8.0 – 8.4 holding the middle of the range.  Based on the Overall rate analysis, and considering subject specifics and room count, a multiplier somewhat above 8.4 and well below 10 is best supported for the subject.  An inferred multiplier of 8.5, applied to the NOI/unit forecast for the subject property in the Income Capitalization Approach ($3,363), returns an indication of value of $28,585/unit.
>
> "* * * The sales comparison analysis and NOI/SF ranking analysis are mutually supportive.
>
> "* * * The indicated market value of the subject property via the Sales

Comparison Approach is ($28,585 x 74 units), rounded to: **$2,115,000**."

(*Id*. at 64.) (Emphasis in original.)  Skilton was questioned about the year built for the comparable properties and no time adjustment from date of sale to assessment date.  He conceded that the subject property should have been "ranked lower" on his "grid," but a lower ranking would not "change the multiplier."  In response to questioning, Skilton testified that "NOI/unit is another measure to check if" value determination "is in right ballpark."

Tucker testified that even though "[a] sales approach was applied[,] * * * no emphasis is given the sales comparison approach in the final value conclusion[]" and it was "presented as a basis for deriving a capitalization rate for the subject, a test of reasonableness, and for informational purposes."  (*See* Def's Ex A at 64.)  In his appraisal report, Tucker wrote:

> "[S]ales of hotel/motels generally reflect going concern value.  That is, the sale price includes the real estate, personal property, and business value.  There was not sufficient information available to segregate the value of personal property or business value from the comparable sales prices of the going concern."

(*Id*.)  Tucker testified that he made three adjustments to the sale prices of the eight identified comparable properties: economic trends (a five percent annual adjustment "when the sale occurred prior to the valuation date[]"); location (because the subject property "is in a rural county[;] [h]otels in more populous counties were adjusted downward 5 to 10% for location[]"); and age/condition (because the "comparable sales were built between 1964 and 2005[,] * * * [they] were adjusted upward from 5 to 30% depending on their age (year built).")  (*See id*. at 76.)  Tucker testified that the comparable properties' adjusted sales prices ranged from $68,964 to $89,107, with an average of $80.186.  (*See id*.)  He testified that because "the subject is only two years old, and has a very well recognized franchise, a value at the upper end of the range is concluded."  (*See id*.)  Tucker testified that his "final reconciled per unit value is $89,000 less

///

DECISION  TC-MD 100605D                                                                                           13

$10,000 [estimated] for FF&E in place, or $79,000 per unit for real estate only[,]" or $6,590,000 (rounded). (*See id.*)

6. *Furniture, fixtures and equipment*

The parties do not dispute that the subject property is equipped with furniture, fixtures and equipment as required by the franchisor, Hampton Inns. (*Id.* at 104, 105.) Skilton made no adjustment to his real market value determinations for the furniture, stating "these items are typically included with the property with no separate value allocation when there is an ownership transfer. The property furnishings and fixtures are estimated at approximately $2,000 per unit ($148,000)." (Ptf's Ex 1 at 22.) Skilton was questioned as to whether he made a "going concern valuation" or a determination of the "real estate value." In response, Skilton testified that his appraisal used "a business value approach."

Tucker testified that because "[n]o historical costs of FF&E were provided by the owner[,]" he relied on "the HVS 'Hotel Development Cost Survey 2008' " to estimate "the value of personal property." (Def's Ex A at 51.) Tucker's "concluded value of personal property at the subject is $10,000 per room x 74 rooms: **$740,000**. (*Id.*) (Emphasis in original.)

7. *Reconciliation and final value conclusions*

Skilton concluded that the income capitalization approach was "given significant emphasis in developing the final opinion of value[]" and the sales comparison approach was "given primary emphasis in developing the final opinion of value[]" but the cost approach was "given little emphasis in development of the final opinion of value." (Ptf's Ex 1 at 70.) Skilton concluded an "**as-stabilized market value, as of June 2010**," of "**$2,115,000**." (*Id.*) (Emphasis in original.) Skilton was asked about two other appraisals of the subject property that he prepared. (*See* Def's Exs B, C.) Skilton testified that he prepared an appraisal for "financing

purposes" and a second appraisal for the property owner's tax appeal to the Umatilla County Board of Property Tax Appeals. He acknowledged that he determined real market values in the "$5 to $6 Million" range for the "financing appraisal" and a real market value of $2,310,000 for the "tax appeal." In response to questioning, Skilton testified that he prepared the "financing appraisal" before "construction commenced" and "in hindsight, almost none of the expectations came true." For the appraisal he prepared for the "tax appeal," Skilton testified that he "incorporated 2009 market activity."

In reaching a conclusion of real market value, Tucker testified that he "placed significant emphasis on the cost approach but it is secondary to the income approach." (*See* Def's Ex A at 92.) Tucker testified that he "reconciled to the following value conclusion, as of January 1, 2009, subject to the Limiting Conditions and Assumptions of this appraisal[:] * * * $5,600,000[.]" (*See id*. at 93)

8. *Absorption or stabilization calculations*

Because he concluded the "subject was not market stabilized as of the date of value, January 2009[,]" Skilton developed the "[i]ncome loss accrued as operations ramp up to market[.]" (Ptf's 1 at 70.) He testified that the subject property "is catching up to the competition, it still has not reached stabilization even though most limited service hotels reach stabilization within a year max." (*See id*.) Skilton deducted the computed "income loss attributable to operational ramp-up, and an additional 10% unearned profit, from the opinion of stabilized value[]" to conclude a "[r]etrospective going concern value of the hotel property, as of January 2009, * * * rounded to: **$1,930,000[.]**" (*Id.* at 71.) (Emphasis in original.)

Tucker concluded that the subject property "is an above average hotel compared to its competition." (Def's Ex A at 91.) In his appraisal report, Tucker wrote:

"There is no reason it should not reach stabilized occupancy within a typical absorption period of about one year. I have deducted business value for stabilized operations, which includes stabilization costs. No further deduction is made for stabilization costs."

(*Id.*)

## II. ANALYSIS

The issue before the court is the 2009-10 real market value of Plaintiff's property. Real market value is the standard used throughout the ad valorem statutes except for special assessments. *See Richardson v. Clackamas County Assessor*, TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1),[1] which reads:

"Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

There are three approaches of valuation (cost, income, and comparable sales) that must be considered in determining the real market value of a property even if one of the approaches is found to not be applicable. *See* ORS 308.205(2) and OAR 150-308.205-(A)(2). Skilton and Tucker considered each of the three approaches of valuation. In reaching a valuation conclusion, Skilton placed " significant emphasis" on the income capitalization approach, "primary emphasis" on the sales comparison approach, and "little emphasis" on the cost approach. (*See* Ptf's Ex 1 at70.) In contrast, Tucker placed "significant emphasis on the cost approach" but gave the "most emphasis [to the] income approach." (Def's Ex A at 92.) Because the parties gave consideration to each of the three approaches of valuation, the court will discuss each approach.

///

---

[1] References to the Oregon Revised Statutes (ORS) and Oregon Administrative Rules (OAR) are to year 2007.

A.       *Cost approach*

"In its classic form, the cost approach produces an opinion of value of the fee simple interest in the real estate[]" at stabilized occupancy.  Appraisal Institute, *The Appraisal of Real Estate* 378 (13th ed 2009).  "Because cost and market value are usually more closely related when properties are new, the cost approach is important in estimating the market value of new or relatively new construction."  *Id*. at 382.

The subject property is "new or relatively new construction," having been completed approximately six months prior to the assessment date.  Skilton and Tucker determined significantly different total land and improvements replacement costs new for the subject property.  Their differences begin with their land real market value determination.  Skilton determined a land real market value of $360,000 and Tucker determined a land real market value of $470,000.  Skilton relied on five land sales occurring in 2008 and located in Oregon and Washington.  Tucker relied on three land sales, all located in Pendleton, Oregon, that sold in 2006, 2007, and 2009.  Given the subject property's assessment date of January 1, 2009, land sales occurring closer to that date are given greater consideration.  The court also gives more consideration to sales that are similar in size to the subject property.  After review of the land sales considered by the two appraisers, the court accepts Skilton's land real market value.

With respect to the subject property's improvements, Skilton and Tucker estimated the replaced cost of the subject property's building and site improvements using the Marshall & Swift Valuation Manual.   The appraisers used different price per square foot for the base cost based on each appraiser's conclusion of the quality of the improvement.  Tucker added "soft costs" identified as engineering, architectural, and permits and legal.  (Def's Ex A at 63.) Plaintiff successfully challenged Tucker's inclusion of those costs through its cross examination

of Tucker, asking him to read from the Marshall & Swift Valuation Manual, stating that those costs are included in the base cost for limited service hotels. In addition, Tucker added in an elevator cost that he testified he would not include if he had an opportunity to redo his determination. Skilton concluded a real market value of $4,674,257, including an eight percent developer's profit and overhead. (Ptf's Ex 1 at 52.) Tucker concluded a real market value of $5,472,524 including a ten percent developer's profit and excluding elevators and "soft costs." (Def's Ex A at 63.)

After adjusting for the elevators and soft costs, the difference in each appraiser's determination of replacement cost is the developer's profit percentage and, most significant, the base cost related to each appraiser's quality determination. Skilton determined that the subject property's quality was closer to average and Tucker determined that the quality was midpoint between average and good. Given that the subject property was constructed in accordance with the Hampton franchise agreement, the subject property's quality is likely midpoint between average and good. After reviewing the evidence, the court concludes that the subject property's total land and replacement cost new is $5,800,000.

The court disagrees with Plaintiff that as of the assessment date the subject property incurred physical depreciation equivalent to two years of its expected 40-year life. (Ptf's Ex 1 at 54.) As of the assessment date, the subject property was less than six months into its expected 40-year life, and there was no evidence presented to support Plaintiff's determination. Plaintiff further reduced its real market value for functional and economic obsolescence. Skilton concluded that the subject property was "over" improved, indicating "some functional obsolescence" and the subject property suffered from "significant external obsolescence" because "available income under current market conditions would not justify development costs,

and the project would not be built today." (Ptf's Ex 1 at 53.) Plaintiff's determination that the subject property experienced some type of obsolescence is supported by the real market value determined using the income approach that follows.

B.    *Income approach*

"Any property that generates income can be valued using the income capitalization approach." *The Appraisal of Real Estate* at 447. "In the income capitalization approach, an appraiser analyzes a property's capacity to generate future benefits and capitalizes the income into an indication of present value. The principle of anticipation is fundamental to the approach." *Id*. at 445. Anticipation is defined as "the perception that value is created by the expectation of benefits to be derived in the future." *Id*. at 35.

1.    *Income capitalization approach*

The income approach was given "significant emphasis" by Plaintiff and the most "emphasis" by Defendant in determining the subject property's real market value. (Ptf's Ex 1 at 70; Def's Ex A at 92.) The appraisers did not agree on any of the income approach components (gross revenue, expenses, capitalization rate, or property tax rate).

Beginning with gross income, the starting point is revenue per available room (RevPAR). Skilton determined a $37 RevPAR and Tucker determined a $61.75 RevPAR. (Ptf's Ex 1 at 55; Def's Ex A at 79.) Even though both appraisers had access to the Smith Travel Research survey that reported actual RevPAR for the subject property and its competitors (excluding the subject property), neither appraiser selected a RevPAR close to the reported actual amounts for 2008 or 2009. A review of the 2008, 2009, and 2010 reports provides significant information about the impact of adding 74 additional hotel rooms to the existing 268 hotel rooms in the same location, especially during a period of economic downturn. (*See generally* Ptf's Exs 7, 8.) Looking first

to occupancy of the subject property's competition, the year to year drop in occupancy between 2008 and 2009 was 6.6 percent with a slight increase in occupancy between 2009 and 2010. The RevPAR for subject property's competition was approximately $50 for the 12 months ending December 2009 and $53 for the same period ending December 2010. The RevPAR increased $3, the approximate same rate as the average daily rate from 2009 to 2010. The court concludes that the RevPAR determined by the appraisers is not supported by the evidence. Given the governing premise of stabilized income and evidence, the court concludes a RevPAR of $55, resulting in a gross operating income (rounded) of $1,500,000.

Tucker determined that, based on national data, the subject property should annually collect other income. Plaintiff's actual operating statements reported a nominal amount of miscellaneous revenue for tax year 2009, and Patel testified that the subject property does not receive other income in an amount close to the national average. The court concludes that its rounded gross operating income includes an amount of other income that could be collected by the subject property once the property reaches stabilization.

Looking next to the expense ratio, Skilton determined a 72.19 percent expense ratio using actual operating expenses with some actual expenses omitted. (Ptf's Ex 1 at 57.) Even though Skilton submitted an "Expense Comparable Summary Table[,]" showing actual expenses for two other limited service hotels, Skilton discounted the expense ratio to approximately 65.5 percent based on the characteristics of the limited service hotels he selected. (Id. at 56.) Tucker determined a 67.6 percent expense ratio, relying on the "average expense ratio of the 8 comparable sales used in the sales comparison approach" plus an "above average franchise royalty fees and replacement reserves." (Def's Ex A at 79.) He also relied on the Smith Travel Research Host Study for limited service hotels in the Pacific Region of the U.S. (*Id*.) Based on

the evidence presented, the court concludes that the subject property is more similar in location and age to limited service hotels with a higher than average expense ratio. The court concludes that 67 percent is a reasonable expense ratio.

Having determined a net operating income of $490,000 (rounded), the computed net operating income is capitalized by an overall capitalization rate including property taxes to determine the subject property's real market value. Skilton computed an overall capitalization rate of 13.91 percent, including a 1.91 percent property tax rate. (Ptf's Ex 1 at 61.) Tucker computed an overall capitalization rate of 10.32, including a 1.32 percent property tax rate. (Def's Ex A at 83.) Because Skilton used a property tax rate that was not adjusted for the property change ratio, the court accepts Tucker's 1.32 percent property tax rate. Tucker selected a capitalization rate at the mid-range of the eight comparable sales he identified. With the exception of one sale, all of the sales relied on by Tucker occurred primarily in 2007, more than 12 months prior to the assessment date and prior to the date when significant change in the capital markets occurred. (*Id*. at 82.) After reviewing the *Korpacz* investor survey and the "[o]verall rates * * * extracted from franchised and good-quality non-flagged hotels[,]" Skilton selected a capitalization rate at the high end of the rate range. (Ptf's Ex 1 at 58, 59.)

Both appraisers allowed an expense deduction for reserves for replacement in arriving at net operating income. (Ptf's Ex 1 at 57; Def's Ex A at 82.) This court has previously raised a concern that "it is an error for [an] appraiser to develop a cap[italization] rate based on comparables that do not subtract reserves for replacement when reaching NOI and to then apply that cap[italization] rate to an NOI for the subject that has * * * reserves subtracted." *Allen v. Dept. of Rev.*, 17 OTR 248, 262 (2003) (footnote omitted). Neither appraiser submitted evidence addressing whether the comparable properties did or did not deduct reserves for replacement.

After considering all the evidence, the court concludes that the overall capitalization rate including property taxes is 11.32 percent. The subject property's total real market value is $4,340,000 (rounded).

The subject property's real market value determined by the income approach must be reduced for the subject property's personal property value. The court accepts Defendant's "concluded value of [the subject property's] personal property" is $740,000. (Def's Ex A at 51.)

Using the income approach, the subject property's real market value excluding personal property as of the assessment date is $3,600,000 (rounded).

2. *Effective gross income multiplier analysis*

Using the same eight sales as used in the comparable sales approach, Tucker determined an effective gross income multiplier for each comparable property that ranged from 3.53 to 4.04, and averaged 3.81. (Def's Ex A at 86.) Tucker "reconciled to a multiplier of 3.9." (*Id.*) In his report, Tucker did not provide detail showing how he developed "the appropriate EGIM thorough analysis of comparable sales." (*Id.*) The accuracy of the comparable properties' effective gross income, one of two key components used to compute a multiplier, is unknown. The court places no weight on Tucker's determination of real market value using an effective gross income multiplier.

C. *Comparable sales approach*

The comparable sales approach "may be used to value improved properties, vacant land, or land being considered as though vacant." *Chambers Management Corp and McKenzie River Motors v. Lane County Assessor*, TC-MD No 060354D at 6 (Apr 3, 2007) (citing Appraisal Institute, *The Appraisal of Real Estate* 335 (12th ed 2001)). ORS 308.205(2) provides, in pertinent part that "[r]eal market value in all cases shall be determined by methods and

procedures in accordance with rules adopted by the Department of Revenue[.]" The Department of Revenue adopted OAR 150-308.205-(A)(2)(c), stating that:

> "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions."

Skilton identified five properties located in Oregon and Washington as comparable to the subject property. (Ptf's Ex 1 at 63.) Three of the five properties were built prior to 1980 and four of the five properties have a fewer number of rooms than the subject property. (*Id*. at 65.) Given the differences (location, age, and size), Skilton concluded that to "refine value" a net operating income per unit ranking analysis was required. (*Id*. at 63.) That analysis relies on Skilton's income approach, including his computed net operating income ($3,363 per room) for the subject property and an "inferred multiplier of 8.5" in determining a real market value of $2,115,000. (*Id*. at 60, 64.) Because the court disagrees with Skilton's computed net operating income, Skilton's primary emphasis on the real market value determined by the sales comparison approach is not accepted by the court. Using Skilton's "inferred multiplier of 8.5" and the court's determined net operating income computed to a per room amount of $6,622, the court's determined real market value is $4,165,000.

Tucker identified eight properties as comparable to the subject property. To the comparable sales, Tucker made three adjustments: time trend, location, and age/condition. (Def's Ex A at 75.) After his adjustments, the adjusted values of the comparable properties ranged from $68,964 to $89,107. (*Id.* at 76.) Tucker determined a reconciled per unit value of $79,000 or a real market value excluding personal property of $5,846,000. (*Id.*) With the exception of one sale, all of the sales relied on by Tucker occurred primarily in 2007, more than 12 months prior to the assessment date and prior to the date when significant change in the

capital markets occurred. In his determination of value, Tucker placed no "emphasis" on the comparable sales approach. (Def's Ex A at 92.)

Given the testimony and evidence, the court finds the comparable sales approach using Skilton's inferred multiplier supports the real market value determined by the court using the income approach. Given the sale date of Tucker's comparable properties, the court agrees with Tucker that no emphasis should be placed on his determination of real market value using the comparable sales approach.

III. CONCLUSION

After careful consideration of the testimony and evidence, the court concludes that the best indicator of the subject property's real market value is the income approach. The evidence supports the conclusion that given the market, the cost to replace the subject property is substantially more than the income that can be generated at stabilization. The court concludes that the subject property's total real market value including personal property as of January 1, 2009, is $4,340,000. The court's accepts Defendant's determination of the subject property's personal property real market value of $740,000. Now, therefore,

IT IS THE DECISION OF THIS COURT that the 2009-10 real market value of property identified as Account 112583 is $3,600,000.

Dated this ____ day of January 2012

_____
JILL A. TANNER
PRESIDING MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*
*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*
*This document was signed by Presiding Magistrate Jill A. Tanner on January 13, 2012. The Court filed and entered this document on January 13, 2012.*

DECISION  TC-MD 100605D                                                                                    24